| | |
|---|---|
| TRAVIS JENKINS, | ) |
|           Petitioner, | ) |
| | ) |
| v. | )   SEALED ORDER |
| | ) |
| UNITED STATES OF AMERICA, | ) |
|           Respondent. | ) |

This matter is before the court on Travis Jenkins's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [DE-38]. Also before the court is the Government's Motion to Dismiss [DE-48], which the court construes as a motion for summary judgment.[1] The issues have been fully briefed, and the matter is now ripe for ruling. For the reasons more fully stated below, Jenkins is not entitled to relief on his § 2255 motion, and the motion is DENIED. The Government's Motion for Summary Judgment is ALLOWED in part and DENIED in part.

## I. Factual and Procedural Background

On June 11, 2013, Jenkins was named in a five-count indictment. *See* Indictment [DE-5]. In Count One, Jenkins was charged with conspiracy to distribute and possess with intent to distribute twenty-eight grams or more of cocaine base (crack), in violation of 21 U.S.C. § 846. *See id.* Counts Two through Four charged Jenkins with distribution of a quantity of cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1). *See id.* In Count Five, Jenkins was charged with

---

[1] In an order [DE-78] entered on December 22, 2015, the parties were advised that the court intended to construe the Government's Motion to Dismiss [DE-48] as a motion for summary judgment.

possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c). *See id.* At Jenkins's arraignment, held on September 3, 2013, he pled guilty to all five counts without a written plea agreement.

On April 30, 2014, the court held Jenkins's sentencing hearing. Jenkins was sentenced to seventy-one months' imprisonment on each of Counts One through Four, to be served concurrently. *See* Judgment [DE-28]. Jenkins was sentenced to sixty months' imprisonment on Count Five, to be served consecutive to Counts One through Four. *See id.*

Jenkins did not appeal his conviction or sentence. On April 30, 2015, Jenkins's sentence was reduced to 105 months' imprisonment, pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.[2] *See* Sealed Order [DE-37].

On May 13, 2015, Jenkins filed the instant *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [DE-38]. In his § 2255 motion, Jenkins argues that he received ineffective assistance of counsel in the following respects: (1) his attorney failed to file a notice of appeal; (2) his attorney advised him to plead guilty; and (3) his attorney failed to investigate his defense to Count Five. The court held an evidentiary hearing on March 22, 2016, to address Jenkins's first claim.

## II. Legal Standard

Summary judgment is appropriate where there is no genuine issue of material fact and it appears that the moving party is entitled to judgment as a matter of law. *United States v. Lee*, 943 F.2d 366, 368 (4th Cir. 1991) (applying the summary judgment standard to a motion to

---

[2] Counts One, Two, Three, and Four were reduced to forty-five months' imprisonment, to be served concurrently. Count Five remained sixty months' imprisonment, to be served consecutive to Counts One through Four.

2

vacate). Any permissible inferences which are drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Summary judgment is appropriate when the record taken as a whole could not lead a trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. Discussion

**A. Jenkins has failed to raise a genuine issue of material fact in his second and third claims.**

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The petitioner bears the burden of proof as to both prongs of the *Strickland* standard. *United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010). Under the first prong, the petitioner must show that his counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As for the second prong, the petitioner must demonstrate that his counsel's inadequate performance was prejudicial to him. *Id.* at 687. Specifically, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* The court will apply the *Strickland* standard to each of Jenkins's ineffective assistance of counsel claims.

3

**1. Jenkins alleges that his attorney provided ineffective assistance of counsel by advising him to plead guilty.**

In his second claim, Jenkins alleges that his attorney provided ineffective assistance when he erred in his assessment of the Government's case. Mot. Vacate [DE-38] at 5. Jenkins contends that his attorney advised him to plead guilty to each count, without a plea agreement, or he would receive a sentence in the range of thirty-five years to life. *Id*; Jenkins's Declaration [DE-38-1] at 1. Jenkins concludes that if his attorney had adequately assessed his case and properly advised him, he would have taken his case to trial. Mot. Vacate [DE-38] at 5.

In his declaration, Daniel Henry Johnson, Jenkins's trial attorney, states that he has no recollection of providing Jenkins with the advice that if he took his case to trial he would receive a sentence in the range of thirty-five years to life. Johnson Decl. [DE-49-1] at 3. Johnson further states that his initial assessment of Jenkins's possible sentence, which came long before Jenkins's arraignment, was close to the guideline range that was calculated by the probation officer in the Presentence Report, and included an estimate both with and without acceptance of responsibility. *Id.* According to Johnson, he advised Jenkins to plead guilty because the evidence of his guilt was overwhelming. *Id.* Johnson states that Jenkins was caught on video conducting drug transactions and had a handgun tucked in his waistband when he was arrested. *Id.* Johnson explains that he also advised Jenkins to plead guilty because, if he went to trial, he would lose acceptance of responsibility and any chance for a 5K motion. *Id.*

This claim must fail under the first prong of the *Strickland* standard because Jenkins has failed to show there is a genuine issue of material fact regarding whether his attorney provided deficient performance by advising him to plead guilty. The evidence of Jenkins's guilt was

4

overwhelming, including Jenkins on tape conducting drug transactions and being arrested thereafter with a gun in his possession. Also, Johnson properly advised Jenkins to plead guilty so he would not lose acceptance of responsibility and the chance for a 5K motion.

This claim also fails under the second prong of the *Strickland* standard because Jenkins has failed to show there is a genuine issue of material fact on prejudice. Even if Jenkins had taken his case to trial, he would likely have been convicted. With respect to Counts one through Four, Jenkins was caught on video conducting drug transactions. As for Count Five, Jenkins had a gun on him when he was arrested following the third and final drug transaction.

There are no genuine issues of material fact under either prong of the *Strickland* standard. Consequently, the Government is entitled to summary judgment on Jenkins's second claim.

**2. Jenkins alleges that his attorney provided ineffective assistance of counsel by failing to investigate his defense to Count Five.**

Jenkins alleges in his third claim that his attorney provided ineffective assistance by failing to investigate his defense to Count Five. Mot. Vacate [DE-38] at 7. Specifically, Jenkins contends that the firearm was possessed in connection with his post-traumatic stress disorder ("PTSD"). *Id.* Jenkins concludes that if his attorney had properly investigated this defense and advised him, he would have gone to trial on Count Five. *Id.*

This claim must fail under the first prong of the *Strickland* standard because Jenkins has failed to show that there is a genuine issue of material fact regarding his attorney's performance as it relates to a defense for Count Five. Jenkins's claim that he possessed the firearm in connection to his PTSD does not raise a defense to Count Five. "As a matter of law, 'self-defense is irrelevant to a section 924(c) violation.'" *United States v. Sloley*, 19 F.3d 149, 153 (4th

5

Cir. 1994) (quoting *United States v. Poindexter*, 942 F.2d 354, 360 (6th Cir. 1991)); *accord United States v. Johnson*, 977 F.2d 1360, 1378 (10th Cir. 1992) ("[O]nce the association between the use of firearms and drug trafficking is shown, any additional finding that self defense motivated use of the firearms is not relevant to a conviction under § 924.")

Jenkins has made an insufficient showing on the performance prong of the *Strickland* standard; thus, this court need not address the prejudice prong. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one."). Consequently, the Government is entitled to summary judgment on Jenkins's third claim.

**B. Jenkins is not entitled to relief on his first claim.**

In the first claim of his § 2255 motion, Jenkins alleges that his attorney provided ineffective assistance of counsel by failing to file a notice of appeal after being placed on reasonable notice that he wanted to appeal. Mot. Vacate [DE-38] at 4. Johnson, Jenkins's attorney, states that Jenkins instructed him not to file a notice of appeal and to pursue a Rule 35 sentence reduction. Johnson Decl. [DE-49-1] at 1. Johnson further states that he was surprised when Jenkins said he didn't want to pursue an appeal, but Johnson believed it was the correct decision because it would enhance his chances of obtaining a Rule 35 sentence reduction. *Id.* at 2. The court concludes that Jenkins has presented a genuine issue of material fact with respect to this claim. For this reason, the Government's Motion Summary Judgment, as it relates to Jenkins's first claim, is DENIED. Nevertheless, for the reasons set forth below, the court concludes that Jenkins is not entitled to relief on his first claim.

**1. Applicable Law**

It is well established that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). "[A]n attorney is required to file a notice of appeal when unequivocally instructed to do so by his client, even if doing so would be contrary to the plea agreement and harmful to the client's interests." *United States v. Poindexter*, 492 F.3d 263, 273 (4th Cir. 2007).

In *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), the Supreme Court discussed an attorney's obligation to consult with his client about an appeal. The Court noted that an attorney has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to believe that a rational defendant would want to appeal, or that this particular defendant has reasonably demonstrated to his attorney that he was interested in appealing. *Flores-Ortega*, 528 U.S. at 480. In evaluating whether an attorney had a constitutional duty to consult,

> the Court [in *Flores-Ortega*] indicated that several factors were relevant, including whether the conviction followed a trial or guilty plea. In cases involving guilty pleas, the Court instructed lower courts to consider whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived appeal rights.

*Poindexter*, 492 F.3d at 268 (internal quotation marks and citation omitted).

### 2. Evidentiary Hearing

On March 22, 2016, the court held an evidentiary hearing on Jenkins's first claim. At the hearing, Jenkins was present and represented by appointed counsel Mary Jude Darrow. Assistant United States Attorney Jennifer May-Parker represented the Government. The court heard testimony from Travis Jenkins and his trial attorney, Daniel Henry Johnson.

#### a. Travis Jenkins's Testimony

7

At the March 22, 2016 evidentiary hearing, Travis Jenkins testified as follows: In 2011, I sold "something" on three occasions to an individual I later learned was a cooperating witness for the Government. In the first transaction, on March 29, 2011, I sold fourteen grams of look-alikes. On April 13, 2011, in the second transaction, I sold a twenty-five gram mixture consisting of look-alikes and cocaine base. Finally, on the third transaction, on May 16, 2011, I sold a twenty-gram mixture, consisting of look-alikes and cocaine base. The third transaction took place on the corner of Mulberry Street and Patrick Street in Goldsboro, North Carolina.

After the third transaction, I went to a house about five to six miles away on Slocumb Street and was arrested there. I was informed that I was being arrested for the drug transactions. I was searched, but no weapon was found. I brought it to law enforcement's attention that I had a gun. I went into custody at the time of my arrest.

On June 11, 2013, I was indicted by the federal government. I already had an attorney for purposes of federal charges, Daniel Henry Johnson. Johnson entered the case to represent me in 2011.

Johnson was present at my initial appearance, which was held in North Carolina. At that time, the Magistrate Judge explained what the charges were against me. There were five charges in the indictment, including a gun charge.

I had time to discuss my case with Johnson, but I can't recall if he reviewed the discovery with me. Johnson said that for the amount of substantial assistance I had provided, he should be able to negotiate a plea for five years.

Johnson presented me with a plea agreement that had been prepared by the Government. The plea agreement called for me to plead guilty to the following: Count One; one of the

8

substantive counts of distribution of a quantity of crack cocaine; and Count Five, the § 924(c) charge. The plea agreement contained an appellate waiver. When I learned that the Government was not going to give me a 5K motion, I knew I was not going to give up my appellate rights. Johnson knew that I would not accept the Government's plea offer because I was unwilling to give up my appellate rights. A suitable plea in my mind exposed me to a sentence of only five years, especially in light of all the assistance I had given the Government.

I kept telling Johnson that I did not have the gun present with me during the drug transactions. My position was that because I did not have the gun with me at the time of the drug transactions, the § 924(c) charge, Count Five, was not valid. Johnson advised me that it did not matter, and if I went to trial on that charge, I would be convicted. I told Johnson that if it had been a felon in possession of a firearm charge, I could understand it, but I did not agree that I possessed the gun in furtherance of a drug trafficking crime. Johnson advised me that it would be in my best interest to plead guilty. Johnson said that if I did not plead guilty, I would get a sentence of thirty-five years. After I pled guilty, I learned that I was not facing a sentence of thirty-five years.

I recall my arraignment where the judge advised me of the penalties I faced for each charge in the indictment. I was also advised of my rights, such as the right to go to trial. I was advised that if I went to trial, the Government would have to produce certain evidence against me in order to convict me. During my arraignment, I pled guilty to Count One. I had concerns about Count One, but I didn't raise those concerns. I also pled guilty to Counts Two through Four. I did not hesitate or need to confer with my attorney regarding Counts One through Four. When the judge asked me how I pled to Count Five, I did not immediately answer

9

him because I did not agree with the charge. Prior to providing the court with an answer on Count Five, I had a discussion with Johnson. I told him that I did not agree with the charge because I did not have the gun in furtherance of a drug trafficking crime. I left the gun some place else because I was afraid to have a gun on me during the drug transaction. Johnson told me it didn't matter because I had the gun on me when I was arrested. Johnson advised me to plead guilty. I did not know that I did not have to follow Johnson's advice. Also, I did not know that if I had pled not guilty on Count Five, I would have then gone to trial on that count. If I had understood that I had a defense to Count Five and could have proceeded to trial, I would have pled not guilty to that charge.

When the judge asked me a second time how I pled as to Count Five, I pled guilty. The judge then asked me if I was in fact guilty, and I responded affirmatively. I responded affirmatively because Johnson made me think I didn't have a defense. Also, I was nervous and scared.

At my arraignment, I swore to tell the truth. For each count that I pled guilty to I admitted that I had committed that crime. At the time, I was off my medications for PTSD. The medications I had been taking were Effexor, Seroquel, and Neurontin. Without these medications, I couldn't fully analyze situations and make clear decisions. At the same time, I understood that I was pleading guilty to all five counts of the indictment, and I understood each charge.

Afer arraignment but before sentencing, I met with Johnson to review the Presentence Report and get an update on his attempts to get me a 5K motion. I told Johnson that I wanted to withdraw my guilty plea because the prosecutor said she was not going to give me a 5K motion.

10

My sentencing hearing was initially scheduled to occur on April 1, 2014. The hearing was continued until April 30, 2014, because Johnson learned the night before that the Government was not going to file a 5K motion. Johnson wanted to find out why I was not getting the 5K motion. In light of all my assistance, Johnson could not believe the Government was not giving me a 5K motion.

At my sentencing hearing, held on April 30, 2014, I told the judge about my PTSD. Johnson informed the court that I cooperated with the Government, and he argued for a lower sentence than I received. I did not ask the judge to withdraw my guilty plea. I can't recall if the judge told me that I had a right to appeal. After my sentencing hearing, I told Johnson and my wife that I planned to appeal.

Immediately following my sentencing hearing, the U.S. Marshals took me to the holding cell. In the holding cell, I told Johnson that I wanted to file an appeal and get a Rule 35 sentence reduction. Johnson told me that he did not handle the appeal process, and I would have to get in contact with the public defender's office. Johnson said that the public defender's office would get in contact with me and assign me an appellate attorney. Johnson said he wanted to pursue a Rule 35 sentence reduction for me.

I was held in the New Hanover County Regional Jail for thirty days following sentencing. Then, I was moved into the custody of the Bureau of Prisons. During this time, I made no efforts to contact the public defender's office. I heard from Johnson, and he told me he was working on the Rule 35 sentence reduction. Johnson and I did not discuss the appeal.

I did not know there was a limited time to file an appeal. At least four or five months after my sentencing, I learned from other inmates that there was a fourteen-day deadline for filing

11

an appeal and that it had passed. I felt betrayed because Johnson never filed an appeal. I never contacted the public defender's office for consultation or advice because my time had expired. I didn't see any reason to pursue it at that point and decided to pursue a § 2255 motion. Nearly a year after sentencing, I started filing my § 2255 motion.

Johnson was successful in getting me a Rule 35 sentence reduction. I got a reduction of twenty-six months. What distresses me now is that the § 924(c) conviction, Count Five, stands, and I have not had the opportunity to appeal it.

### b. Daniel Henry Johnson's Testimony

At the March 22, 2016 evidentiary hearing, Daniel Henry Johnson testified as follows: I am an attorney and have been licensed since 2004. My first few years in practice, I served as a state prosecutor. After that, I went into private practice and did some criminal defense and civil litigation. I began practicing criminal defense in 2009. In 2011, I was appointed to the CJA Panel. Jenkins was not my first appointed case in federal court. I have never worked a federal jury trial, but I have worked fifteen to twenty state jury trials.

In December of 2011, I came to know Jenkins when I was appointed to represent him following his receipt of a target letter from the U.S. Attorney's office. At the time, Jenkins was living in Florida. Jenkins and I had a typical attorney-client relationship. We developed an understanding that when we spoke the other one understood. I had no concerns about Jenkins's mental competency or ability to understand me. I obtained initial discovery in the case and began conversations with Ms. Wells, the Assistant United States Attorney assigned to the case, about a potential resolution.

When I started negotiating with the Government, the Government was trying to go back

12

to the 1980's and 1990's and bootstrap other drug transactions based on Jenkins's admissions to law enforcement. The Government wanted Jenkins to come in and plead guilty pursuant to a plea agreement to a criminal information. Under this plea agreement offered by the Government, Jenkins was asked to plead guilty to a count with a ten-year mandatory minimum sentence with a maximum sentence of life. After reviewing the discovery, I did not think the Government had enough evidence to show a conspiracy involving 280 grams or more of cocaine base. I communicated this to Jenkins and tried to get a more favorable plea agreement.

I continued to talk with the Government about a plea disposition. There was another plea agreement offered to Jenkins. The charge was for twenty-eight grams or more of cocaine base. Under this plea agreement, the minimum sentence was five years and the maximum sentence was forty years. I discussed this plea agreement with Jenkins, including the minimum and maximum sentences. I never told Jenkins he faced a minimum of thirty-five years in prison. I am not sure where the figure of thirty-five years comes from. If I did discuss a potential of thirty-five years with Jenkins, it was not done as a scare tactic. It would have been done so he was aware of all possibilities.

Jenkins was charged in an indictment. At that time, I reviewed the U.S. Sentencing Guidelines with Jenkins. Another plea agreement was offered, which was very similar to the prior plea agreement. Jenkins was upset because he felt like he had provided substantial assistance to the Government and was getting nothing in return. I contacted Ms. Wells and told her Jenkins did not feel like he was getting anything out of this plea agreement and did not want to waive any of his rights. I asked Ms. Wells if Jenkins would be prohibited from getting a 5K motion if he didn't plead guilty pursuant to a plea agreement. The response I got back from Ms.

13

Wells was that it would not influence her decision.

In my discussions with Ms. Wells, the § 924(c) charge was always discussed. I knew there would be a five-year consecutive sentence included with any plea agreement. I tried to get Ms. Wells to dismiss the § 924(c) charge and have a firearm enhancement. The discovery did not reveal that Jenkins was brandishing or otherwise using the firearm. If Jenkins had decided to take the § 924(c) charge to trial and was found guilty, he would have lost acceptance of responsibility and likely the chance to get a 5K motion. Jenkins said to me that he was carrying a gun only because of his PTSD. My conversations with Jenkins were that even if this was true, PTSD is not a defense. Because PTSD could be a mitigating factor, it was raised at sentencing.

Jenkins ultimately decided to plead guilty without a plea agreement. This allowed him to preserve his appellate rights. I did not see that Jenkins had any significant appellate issues to raise. My recollection is that it wasn't that Jenkins had a specific appellate issue he wanted to raise, but he just didn't feel like he was getting anything in return from the plea agreements offered by the Government. Jenkins never said to me that he did not want to give up his appellate rights because he wanted to appeal the PTSD issue. Also, Jenkins never said to me that he did not have a gun in his possession during the last drug transaction. I don't recall seeing any discovery which suggested that Jenkins did not have possession of a gun. In fact, my recollection of the discovery is quite the opposite.

Prior to the Rule 11 hearing, I met with Jenkins four to five times. Jenkins never said to me that he was not guilty of the gun charge. Jenkins did bring up the issue of the PTSD because he said that is why he carried a gun. Jenkins and I discussed whether PTSD is a viable defense or not, and it was my belief that it was not.

I was present with Jenkins at his Rule 11 hearing. I believed Jenkins was competent. I understood Jenkins and I believed that he understood me. The court explained to Jenkins his minimum and maximum sentence exposure for each count in the indictment. Jenkins appeared to understand. Jenkins admitted guilt as to each charge. Jenkins and I conferred on two occasions. I don't recall specifically what we discussed. Jenkins had questions, but I don't remember specifically what they were. I don't think Jenkins was confused by the substance of what was happening.

At times, Jenkins and I discussed withdrawing his plea. I don't recall Jenkins trying to withdraw his guilty plea based on a claim that he didn't have the gun in his possession during the drug transaction. It was my understanding that he did have the gun during the drug transaction. Jenkins was hoping to get a sentence of probation. I discussed Jenkins's Presentence Report ("PSR") with him. Jenkins and I talked about the guideline range in the PSR so that when he went to sentencing he knew what guideline range he faced.

At 4:45 p.m. on the day before Jenkins's sentencing hearing was scheduled to occur, I heard from Ms. Wells that Jenkins would not be getting a 5K motion. The next day, I moved for a continuance of the sentencing hearing to give myself time to speak to Mr. Duffy, Ms. Wells's boss and the head of the criminal division at the U.S. Attorney's office. The court granted the continuance.

I contacted Mr. Duffy and requested a meeting to discuss the decision not to give a 5K motion to Jenkins. I met with Mr. Duffy and discussed Jenkins's substantial assistance. Mr. Duffy said he was going to take it under advisement, look into it, and get back to me. I later learned that because Jenkins did not have a plea agreement, he was not entitled to a 5K motion. I

15

informed Jenkins, and he was upset.

During sentencing, I argued for a downward variance based on Jenkins's cooperation. My thought was to bring it to the court's attention and let the court decide what Jenkins's sentence should be. During the sentencing hearing, at the court's direction, I told Jenkins about Rule 35. The court advised Jenkins that he had the right to appeal. Jenkins felt like there was no point to an appeal. My standard practice is to follow up with a letter memorializing the decision not to appeal, but in this case, for some reason, I did not. I was surprised when Jenkins told me he didn't want to appeal because he had been so focused on preserving his appellate rights. I did think it made sense because the better route was to attempt to get a Rule 35 sentence reduction.

Immediately after sentencing, I talked to Jenkins in lock-up. At the time, Jenkins was very upset. Jenkins had hoped the court would give him a lower sentence. Jenkins was in disbelief that he did not get anything for his cooperation. Jenkins and I talked about his right to an appeal. I told him he had fourteen days to file an appeal. I told Jenkins I didn't think he had any great appellate issues, and he asked to hear more about Rule 35. Jenkins and I did not discuss Count Five and his claim that he did not have the gun in his possession. Jenkins and I did not discuss any specific appellate issues and talked only about the general right to appeal. I told Jenkins that I thought Rule 35 was his best bet for getting his sentence reduced. I also told Jenkins that the Government would look less favorably on his Rule 35 request if he appealed. Jenkins advised me that he wanted to pursue the Rule 35 sentence reduction. Jenkins did not instruct me to file an appeal. This conversation immediately following sentencing is the only conversation Jenkins and I had that occurred during the fourteen-day appeal period.

Following sentencing, I had conversations with Jenkins and his wife. I don't recall

16

Jenkins or his wife ever asking me to file an appeal. At this point in time with my practice, I was familiar with the process of filing an appeal. If I had been instructed to do so, I would have filed a notice of appeal.

I was successful in getting a Rule 35 sentence reduction for Jenkins. Jenkins was upset that the reduction was not greater. In the last communication I had with Jenkins, he said to me that he appreciated all I had done for him. Jenkins also said that he was filing a § 2255 motion and asked me not to stand in his way.

### 3. Discussion

Jenkins's allegations, as contained in his § 2255 motion and related filings and his evidentiary hearing testimony, were contradicted by Johnson's evidentiary hearing testimony. Whether Johnson provided deficient performance under the first prong of the *Strickland* standard requires a credibility determination by the court.

When assessing the credibility of witnesses, the court can consider "variations in demeanor and tone of voice." *Anderson v. Bessemer City, N.C.* 470 U.S. 564, 575 (1985). Courts can also consider documents and objective evidence that may contradict the witness's testimony or show inconsistencies, *id.*, as well as the witness's motive to lie and the specificity of his statements, *Jackson v. United States*, No. 5:07-CR-110-FL-1, 5:12-CV-205-FL, 2014 WL 7149635, at *4 (E.D.N.C. Dec. 15, 2014) (citing *United States v. Wilson*, 624 F.3d 640, 665 (4th Cir. 2010)).

The court concludes that Jenkins's March 22, 2016 evidentiary hearing testimony was not credible for several reasons. First, Jenkins testified that he did not know there was a limited time to file an appeal. This testimony is belied by the record. At the conclusion of Jenkins's April 30,

17

Jenkins or his wife ever asking me to file an appeal. At this point in time with my practice, I was familiar with the process of filing an appeal. If I had been instructed to do so, I would have filed a notice of appeal.

I was successful in getting a Rule 35 sentence reduction for Jenkins. Jenkins was upset that the reduction was not greater. In the last communication I had with Jenkins, he said to me that he appreciated all I had done for him. Jenkins also said that he was filing a § 2255 motion and asked me not to stand in his way.

### 3. Discussion

Jenkins's allegations, as contained in his § 2255 motion and related filings and his evidentiary hearing testimony, were contradicted by Johnson's evidentiary hearing testimony. Whether Johnson provided deficient performance under the first prong of the *Strickland* standard requires a credibility determination by the court.

When assessing the credibility of witnesses, the court can consider "variations in demeanor and tone of voice." *Anderson v. Bessemer City, N.C.* 470 U.S. 564, 575 (1985). Courts can also consider documents and objective evidence that may contradict the witness's testimony or show inconsistencies, *id.*, as well as the witness's motive to lie and the specificity of his statements, *Jackson v. United States*, No. 5:07-CR-110-FL-1, 5:12-CV-205-FL, 2014 WL 7149635, at *4 (E.D.N.C. Dec. 15, 2014) (citing *United States v. Wilson*, 624 F.3d 640, 665 (4th Cir. 2010)).

The court concludes that Jenkins's March 22, 2016 evidentiary hearing testimony was not credible for several reasons. First, Jenkins testified that he did not know there was a limited time to file an appeal. This testimony is belied by the record. At the conclusion of Jenkins's April 30,

2014 sentencing hearing, the court advised him as follows:

> Mr. Jenkins, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there was some other fundamental defect in the proceedings that was not waived by your guilty plea.
> You also have a statutory right to appeal your sentence under certain circumstances, particularly if you think the judgement [sic] - - sentence is contrary to law.
> *With few exceptions, any notice of appeal must be filed within 14 days of the judgment being entered on the docket in your case.*
> If you're unable to pay the costs of appeal, you may apply for leave to appeal in forma pauperis. If you so request, the Clerk of Court will prepare and file a notice of appeal on your behalf.
> If you wish to appeal your conviction or sentence, you're advised to so notify your attorney in writing immediately upon your election to do so.

*See* April 30, 2014 Transcript [DE-36] at 17 (emphasis added).

Second, Jenkins testified that Johnson told him that he did not handle the appeal process, and Jenkins would have to get in contact with the public defender's office. Jenkins also testified that Johnson said that the public defender's office would get in contact with him and assign him an appellate attorney. In either case, during the thirty days that Jenkins was held in the New Hanover County Regional Jail following sentence, he testified that he made absolutely *no* efforts to contact the public defender's office.

Finally, Jenkins testified that immediately following his sentencing hearing, he directed Johnson to file an appeal. Jenkins admitted that when he communicated with Johnson on several occasions after sentencing that he failed to ask about the status of his appeal. It seems logical that if Jenkins had actually directed Johnson to file an appeal, Jenkins would have asked about the status of the appeal in subsequent communications.

In light of the foregoing, the court credits Johnson's version of events in this case and discounts Jenkins's version. The court declines to give any weight to Jenkins's allegation that he

18

specifically directed Johnson to file an appeal. As addressed above, this allegation was directly refuted by Johnson's credible evidentiary hearing testimony. The court concludes that Jenkins has failed to meet his burden of proving that Johnson provided representation that fell below an objective standard of reasonableness. Consequently, Jenkins's first claim must fail under the first prong of the *Strickland* standard.

Jenkins has made an insufficient showing on the performance prong; thus, this court need not address the prejudice prong. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). Accordingly, Jenkins is not entitled to relief on his first claim.

## IV. Conclusion

For the foregoing reasons, Jenkins is not entitled to relief on his § 2255 motion [DE-38], and the motion is DENIED. The Government's Summary Judgment motion [DE-48] is ALLOWED in part and DENIED in part.

A certificate of appealability will not issue unless there has been "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003). However, when a court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484-85.

In light of the applicable standard, the court concludes that Jenkins has not made the requisite showing to support a certificate of appealability. Therefore, a certificate of appealability is DENIED.

SO ORDERED.

This the 14 day of April, 2016.

*James C. Fox*
James C. Fox
Senior United States District Judge

20

Case 5:13-cr-00168-F   Document 87   Filed 04/14/16   Page 20 of 20